**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TAMEEKA ROBERTS,** | **MEMORANDUM & JUDGMENT** |
| Plaintiff, | **13-CV-6161** |
| v. | |
| **UNITED PARCEL SERVICE, INC.,** | |
| Defendant. | |

**Parties**                                    **Appearances**

**Tameeka Roberts**                            Alex Umansky
                                               Phillips & Associates, PLLC
                                               45 Broadway, Suite 620
                                               New York, NY 10006
                                               212-248-7431
                                               aumansky@tpglaws.com

                                               Casimir Joseph Wolnowski
                                               West 116th Street
                                               Apt B209
                                               New York, NY 10026
                                               917-734-0510
                                               cwolnowski@gmail.com

                                               Jessenia Maldonado
                                               Phillips & Associates, PLLC
                                               45 Broadway, Suite 620
                                               New York, NY 10006
                                               212-248-7431
                                               jmaldonado@tpglaws.com

**United Parcel Service, Inc.**                Kerrie R. Heslin
                                               Nukk-Freeman & Cerra, P.C.
                                               636 Morris Turnpike, Suite 2f
                                               Short Hills, NJ 07078
                                               973-564-9100
                                               kheslin@nfclegal.com

Melissa Anne Herbert
Nukk-Freeman & Cerra, P.C.
26 Main Street, Suite 301
Chatham, NJ 07928
973-665-9100
mherbert@nfclegal.com

Rachel Mara Manne
Nukk-Freeman & Cerra, P.C.
26 Main Street, Suite 301
Chatham, NJ 07928
973-665-9100
rmanne@nfclegal.com

**JACK B. WEINSTEIN, Senior United States District Judge:**

I.      Introduction ................................................................................................. 4
II.     Procedural History ....................................................................................... 5
III.    Facts ............................................................................................................ 6
    A.  2007 ....................................................................................................... 6
    B.  2008 ....................................................................................................... 7
    C.  2009 ....................................................................................................... 7
    D.  2010 ....................................................................................................... 8
    E.  2011 ....................................................................................................... 8
    F.  2012 ....................................................................................................... 9
        1.  October 23, 2012: Anonymous Complaint to Corporate Concerns Hotline .................. 9
        2.  October 26, 2012: UPS's First Investigation ................................................. 9
        3.  November 15, 2012: Letter to Corporate Headquarters ..................................... 10
        4.  November 26, 2012: Call to UPS Corporate Concerns Hotline ............................ 10
        5.  November 29, 2012: UPS's Second Investigation .......................................... 11
        6.  December 5, 2012: Alteration of Plaintiff's Time Card ................................... 18
        7.  Early December 2012: Second Investigation Ends ......................................... 18
        8.  Early December 2012: Complaint to New York State Division of Human Rights ....... 19
        9.  December 21, 2012: Plaintiff Hit with Packages During Work ........................... 19
IV.     Legal Standards for District Courts' Review of Jury's Verdict ............................. 21
    A.  Renewed Motion for Judgment as a Matter of Law .......................................... 21
    B.  Motion for a New Trial ............................................................................... 22
V.      New York City Human Rights Law .............................................................. 23
    A.  Context ................................................................................................. 23
    B.  Employment Discrimination Based on Sexual Orientation ............................... 28
        1.  Historical Context .................................................................................. 28
        2.  Prevalence of Workplace Discrimination in the 21st Century ....................... 28
        3.  Protections at the Federal Level ................................................................ 29
        4.  Protections at the State Level .................................................................. 36
        5.  Protections at the Local Level .................................................................. 38
        6.  New York City Human Rights Law ............................................................ 38
    C.  Law: Direct Liability of Employer ............................................................... 39
    D.  Law: Hostile Work Environment ................................................................. 39
    E.  Law: Retaliation ..................................................................................... 41
    F.  Guiding Principles for Both Claims .............................................................. 44
    G.  Application of Facts to Hostile Work Environment Law .................................... 45
    H.  Application of Facts to Retaliation Law ........................................................ 45
VI.     Remittitur of Compensatory Damages ........................................................... 46
    A.  Law ..................................................................................................... 46
    B.  Application of Facts to Law ....................................................................... 47
VII.    Punitive Damages .................................................................................... 48
    A.  Law ..................................................................................................... 48
    B.  Standard of Review for Vacatur of Punitive Damages Awards ........................... 49
    C.  Application of Facts to Law ....................................................................... 49
VIII.   Conclusion ............................................................................................. 50

# I. Introduction

As the nation's understanding and acceptance of sexual orientation evolve, so does the law's definition of appropriate behavior in the workplace. A jury, comprised of a cross-section of our heterogeneous community, is best placed to determine what is appropriate at the moment. *See Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998) (addressing appropriateness of jury assessing alleged gender discrimination in the workplace), *abrogated in part on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

The jury found improper under the law repeated advice from plaintiff's supervisor that her sexual orientation as a lesbian was evil and needed to be changed in accordance with religious dictates.

Appeal to the bible, or theology generally, cannot justify management's condoning the harassing of a lesbian in the workplace. Defendant's central administration failed to protect plaintiff from such abuse.

An award of compensatory and punitive damages was supported by the record.

Plaintiff Tameeka Roberts, a lesbian, sued her employer, defendant United Parcel Service, Inc. ("UPS"), for violations of the New York City Human Rights Law, New York City Administrative Code § 8–502(a), *et seq.* ("NYCHRL"). She claimed that she was subjected to a hostile work environment because of her sexual orientation, and that she was retaliated against for complaining about this demeaning treatment. *See* Compl. ¶ 1, Nov. 5, 2013, ECF No. 1.

A jury found in favor of plaintiff on both counts. Jury Verdict Sheet, June 18, 2015, ECF No. 74. Awarded to plaintiff was $25,000 in compensatory damages on each of her two claims, and an additional $25,000 in punitive damages on each claim. The total judgment was $100,000, plus costs. *Id.*; Trial Tr. 419:25–423:11, June 18, 2015.

Defendant moves (1) to set aside the jury verdict; (2) for judgment of dismissal or a new trial; or, in the alternative, (3) for reduction of compensatory damages; and (4) striking of punitive damages.  All motions are denied.

## II.     Procedural History

During trial, plaintiff withdrew all claims against her supervisor, Donald Woodard, whom she had sued individually.  Trial Tr. 238:8–11, June 17, 2015.

At the conclusion of plaintiff's case, defendant moved for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b); Def.'s Br. in Supp. of its Mot. for J. as a Matter of Law, June 17, 2015, ECF No. 77; Trial Tr. 327:6–328:4, June 17, 2015.  It also moved to dismiss the punitive damages claims.  Def.'s Br. in Supp. of its Mot. for J. as a Matter of Law 9–11; Trial Tr. 327:9–11, 328:5–13, 330:6–11, June 17, 2015.  The motions were denied with leave to renew.  *Id*. at 328:14–329:4.

Following the verdict in favor of plaintiff, defendant renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, a new trial pursuant to Federal Rule of Civil Procedure 59(a).  Trial Tr. 424:9–13, June 18, 2015; Def.'s Br. in Supp. of its Mot. for J. as a Matter of Law or in the Alternative for a New Trial, June 18, 2015, ECF No. 79 ("Def.'s Br."); *see also* Def.'s Reply Br. in Supp. of its Mot. for J. as a Matter of Law or in the Alternative for a New Trial or Remittitur, June 24, 2015, ECF No. 78 ("Def.'s Reply").  Remittitur of the compensatory damages award and vacatur of the punitive damages award were sought.  Def.'s Br.; Def.'s Reply; Trial Tr. 424:11–13, June 18, 2015.  Plaintiff opposed all motions.  Pl.'s Opp'n to Def.'s Mot. for J. as a Matter of Law or in the Alternative for a New Trial, June 22, 2015, ECF No. 76 ("Pl.'s Opp'n").

### III. Facts

Plaintiff, Tameeka Roberts, a forty-one year-old lesbian, lives with her wife and three sons in New Jersey. Trial Tr. 24:12–16, 34:21, 24:24–25:17, June 15, 2015 (Roberts). She has worked for defendant UPS for approximately twenty years, starting in 1995 as a part-time "unloader" at its Maspeth facility in Queens, New York; in 1999, she switched to a part-time position as a "sorter." *Id.* at 27:6–10, 28:7–17, 29:1–4, 30:1–11 (Roberts). She was later assigned two new jobs: small package sorter and "operational data capture clerk." The latter position required scanning international package invoices to ensure accuracy. *Id.* at 30:15–24 (Roberts).

During her career at UPS, plaintiff has had some twenty different supervisors. *Id.* at 31:20–22 (Roberts). This case centers on one: Donald Woodard, a "full-time area coordinator." He supervised plaintiff from 2007 through 2008, and again from 2010 through 2012. *Id.* at 32:7–17, 37:25–38:3 (Roberts); Trial Tr. 271:15, June 17, 2015 (Woodard). Woodard made a continuing series of derogatory comments to plaintiff about her sexual orientation. *See* Trial Tr. 34:10–12, June 15, 2015 (Roberts).

#### A. 2007

Woodard's criticisms started some time in 2007. Speaking to plaintiff, he denigrated another employee's sexual orientation as a lesbian, which was apparently evident from that employee's tattoo. *Id.* at 34:16–24 (Roberts). In response, plaintiff complained directly to Woodard about his comment. *Id.* at 35:2–3 (Roberts). The next day, Woodard brought his bible to work and "showed [plaintiff] . . . where [the bible] says that being a lesbian is wrong." *Id.* at 35:9–13 (Roberts). He told her: "It goes against the bible. . . . It's a sin." *Id.* at 35:13–14 (Roberts). Woodard admitted to having made these comments. Trial Tr. 306:12–309:9, June 17,

2015 (Woodard) (some time during 2007 or 2008); *but see* Riddick Report, Ex. J-7, at UPS 00174–75 (some time in 2011).

In response, plaintiff complained to her shop steward, Vincent Pietraniello, and the head of security, Gary Depotoe. Trial Tr. 35:22–36:1, June 15, 2015 (Roberts) (referring to Pietraniello by nickname "Vinnie P."). During the rest of 2007, Woodard repeatedly told plaintiff that "being a lesbian is wrong" and that she was "going to hell." *Id.* at 36:18–22 (Roberts).

### B. 2008

In 2008, in the presence of one of plaintiff's co-workers, Kenneth Gayden, Woodard told plaintiff: "being a lesbian is a sin." *Id.* at 36:23–37:4 (Roberts); Trial Tr. 249:10–12, June 17, 2015 (Gayden) (Gayden said "[Woodard] told me that [I] shouldn't hang out with [plaintiff], she's not living right. She had demons. She doesn't know who she is."). Plaintiff responded, "this is not church[,]" and stated: "making comments about me being a lesbian is wrong." Trial Tr. 37:7–11, June 15, 2015 (Roberts). Plaintiff complained to her shop steward, Bill Groll. *Id.* at 37:12–17 (Roberts).

Throughout 2008, Woodard made additional comments—stating repeatedly that plaintiff's sexual orientation was "wrong," and that she was "going to hell." *Id.* at 37:18–21 (Roberts). Sometimes, plaintiff would walk away or tell Woodard to "leave me alone." *Id.* at 37:22–24 (Roberts).

### C. 2009

In 2009, for reasons apparently unrelated to plaintiff, Woodard did not work in the Maspeth facility. *Id.* at 37:25–38:3 (Roberts).

**D. 2010**

When Woodard returned as plaintiff's supervisor in 2010, his demeaning comments continued. He again "showed [plaintiff] a bible and stated that . . . being a lesbian is a sin and it's in the bible." *Id.* at 38:4–12 (Roberts). In response, plaintiff told him: "This is not . . . a church and you don't have a right to do that." *Id.* at 38:13–16 (Roberts). She complained for a second time to her shop steward, Bill Groll, stating: "[Woodard] again . . . showed me the bible and I had complained to [another shop steward Vincent Pietraniello] . . . [previously] and [now Woodard is] doing it again." *Id.* at 38:17–22 (Roberts).

Nothing changed. Woodard told plaintiff that "two women being married is not natural." *Id.* at 39:22–23 (Roberts). In response she again complained to shop steward Groll. *Id.* at 40:3–5 (Roberts). Woodard's unwelcome comments continued. He told plaintiff that "being a lesbian is wrong" and that she was "going to hell" and she needed to "change [her] life, the style, the way [she was] living." *Id.* at 40:12–15 (Roberts). Plaintiff complained again to Groll. *Id.* at 40:18–20 (Roberts).

**E. 2011**

In 2011, according to plaintiff, Woodard threatened to take a photo of plaintiff with a married male co-worker and send it to his wife, apparently as a means of suggesting the two were having an affair. Trial Tr. 41:10–12, June 15, 2015 (Roberts). Plaintiff reported the incident, and Woodard's comments about her sexual orientation, to both her night manager, Donnell Pottinger, and to her shop steward, Phil Montenegro *Id.* at 42:2–6 (Roberts) (referring to Phil Montenegro by his first name). Pottinger told her: "do not go to corporate [with your complaints about Woodard]. I will handle the situation[.]" *Id.* at 43:1–3 (Roberts). For about a year, Woodard's comments stopped. *Id.* at 88:5–8 (Roberts).

### F.  2012

In the late summer of 2012, Woodard remarked to plaintiff—that "two women being married is not natural" and that plaintiff was "going to hell."  *Id*. at 44:13–19, 88:9–15 (Roberts).  Plaintiff complained again to Groll, her shop steward.  *Id*. at 45:1–3 (Roberts).

On October 10, 2012, plaintiff overheard Woodard tell a co-worker that someone had "demons" inside her; plaintiff assumed he was speaking about her.  *Id*. at 45:4–19 (Roberts); Trial Tr. 110:2–13, June 16, 2015 (Roberts).  In response, plaintiff complained to shop stewards Groll and Montenegro, who brought her to the offices of Natalie King, a member of the defendant's human resources department, and Mike Reckner, the night manager and Woodard's supervisor.  Trial Tr. 45:22–46:19, June 15, 2015 (Roberts); Trial Tr. 103:1–20, June 16, 2015 (Roberts).

#### 1.  October 23, 2012: Anonymous Complaint to Corporate Concerns Hotline

On October 23, 2012, plaintiff lodged an anonymous complaint with UPS's "Corporate Concerns" hotline.  Trial Tr. 48:11–21, June 15, 2015 (Roberts).  She identified herself as "gay" and stated that she feels "intimidated" and "harassed" because Woodard engages in "religious rants at the job" and makes "derogatory comments about gays."  Ethics and Compliance Reporting, Ex. J-4, at UPS 00156, Oct. 23, 2012; *see* Trial Tr. 149:10–12, 150:1–152:6, 199:7–23, June 16, 2015 (Riddick).

#### 2.  October 26, 2012: UPS's First Investigation

On October 26, 2012, Natalie King, Mike Reckner, Bill Groll and Phil Montenegro met with plaintiff.  On behalf of UPS, they opened an investigation into Woodard's comments.  Trial Tr. 47:2–48:6, June 15, 2015 (Roberts); Trial Tr. 103:9–104:17, June 16, 2015 (Roberts).

The investigation report indicates that Woodard was questioned, and he stated that "he does not talk down to gay people." UPS HR Case Details, Ex. J-5, at UPS 00159, Nov. 14, 2012. In response, human resources cautioned Woodard that "religion has no place in the workplace." *Id.* It reviewed with Woodard UPS's written "professional conduct and anti-harassment policy." *Id.*; UPS Professional Conduct and Anti-Harassment Policy, Ex. J-13, at UPS 000924, Nov. 14, 2012; Trial Tr. 284:6–12, June 17, 2015 (Woodard). The investigation was then closed by UPS. Case Summary, Ex. J-9, at UPS 00167, Mar. 1, 2013. Woodard did not make a subsequent comment directly to plaintiff about her sexual orientation. Trial Tr. 107:22–24, June 16, 2015 (Roberts).

### 3. November 15, 2012: Letter to Corporate Headquarters

Soon after the first investigation by UPS ended, on November 15, 2012, plaintiff sent a letter to defendant's corporate offices in Atlanta, Georgia describing Woodard's comments. Trial Tr. 49:1–10, June 15, 2015 (Roberts); Ethics and Compliance Reporting, Ex. J-6, at UPS 00165–66, Nov. 15, 2012 (Plaintiff's letter). It stated, in part: "I'm contacting you because I'm being harassed by Donald Willard [*sic*] . . . I feel threaten [*sic*] harassed and stressed cause of this situation . . . . Why is Donald Woodard allowed to Harass, Gay Bash and verbal [*sic*] abuse his employees and still be employed at United Parcel Service." Ethics and Compliance Reporting, Ex. J-6, at UPS 00165–66, Nov. 15, 2012 (Plaintiff's letter).

### 4. November 26, 2012: Call to UPS Corporate Concerns Hotline

On November 26, 2012, plaintiff called UPS's Corporate Concerns hotline to complain about Woodard's comments, this time revealing her identity. Trial Tr. 50:16–24, June 15, 2015 (Roberts).

### 5.  November 29, 2012: UPS's Second Investigation

Three days later, Beverly Riddick, then the UPS Human Resources Operations Manager for the district containing the Maspeth facility, opened an investigation.  Riddick Report, Ex. J-7; Trial Tr. 152:13–17, June 16, 2015 (Riddick).  She met with plaintiff for approximately a half-hour.  Trial Tr. 52:10–23, June 15, 2015 (Roberts); Trial Tr. 111:16–19, June 16, 2015 (Roberts); 152:13–17, June 16, 2015 (Riddick).  Riddick told her that UPS was taking her complaint "very seriously," "actively investigating" it, and conducting interviews.  Trial Tr. 111:20–112:23, June 16, 2015 (Roberts).

Riddick also met with Woodard.  Woodard was *not* told to desist.  As she testified at trial about their meeting, the corporate investigator thought his remarks were merely inappropriate:

> Q:      In the meeting with Donald Woodard . . . Woodard also told you that he showed Ms. Roberts the Bible and told her that her sexual orientation is a sin, true?
>
> A:      Yes.
>
> Q:      Donald Woodard also told you that God does not approve of Ms. Roberts homosexuality and showed her the verse from the Bible that says that, correct?
>
> A:      Correct.
>
> Q:      But *you did not tell Mr. Woodard that such comments are illegal* in the workplace, did you?
>
> A:      I did not.
>
> Q:      You didn't tell him that those comments were illegal because you didn't think they were illegal or unlawful.
>
> A:      That is correct.
>
> Q:      *In your opinion, those comments were inappropriate but nothing more, correct?*
>
> A:      Correct.

> Q:      In fact, *you didn't think that telling Ms. Roberts that God . .*
> *. does not approve of her sexual preference constitutes harassment*
> in the workplace, isn't that true?
>
> A:      That's true.

Trial Tr. 154:2–155:1 (Riddick) (emphasis added).

Riddick also interviewed Vincent Pietraniello, plaintiff's union shop steward, Victor

Robinson, an operations data clerk and a bagger for the small sort department, and Kenneth

Gayden, an operations data clerk and bagger.  Trial Tr. 156:12–13, 157:5–6, June 16, 2015

(Riddick); Trial Tr. 245:17–18, June 17, 2015 (Gayden).  She recorded her notes.  *See* Riddick

Report, Ex. J-7.  Riddick later testified about what transpired in the meeting with Pietraniello,

admitting that she did not deem Woodard's remarks illegal:

> Q:      When you met with Vincent Pietraniello, let's call him
> Vincent P., plaintiff's union shop steward, he told you that Donald
> Woodard was asked to leave [another] facility for voicing his
> religious beliefs, isn't that right?
>
> A:      Yes.
>
> Q:      But *in your opinion an employee voicing his religious
> beliefs in the workplace does not constitute discrimination* or
> harassment, correct?
>
> A:      That's correct.
>
> Q:      Vincent P. told you that Donald Woodard made
> unprofessional comments in the workplace, true?
>
> A:      Yes.
>
> Q:      [Vincent] P. also told you that Donald Woodard is very
> temperamental and has eccentric behavior, true?
>
> A:      That is true.

Trial Tr. 156:12–157:1, June 16, 2015 (Riddick) (emphasis added).

Riddick also testified about what she learned from interviewing Victor Robinson, plaintiff's co-worker:

> Q:      You also met with Victor Robinson on December 6th, 2012, correct?
>
> A:      That is correct.
>
> Q:      Victor Robinson is an hourly employee that works in the Maspeth facility with Ms. Roberts, correct?
>
> A:      Yes.
>
> Q:      And [Victor] Robinson told you that he and Donald Woodard discussed religion at work, true?
>
> A:      True.
>
> Q:      *Victor Robinson told you that Donald Woodard said that homosexuality is a sin,* true?
>
> A:      Yes.
>
> Q:      But *in your professional opinion, Woodard stating that homosexuality is a sin, in the workplace, does not constitute discrimination or harassment*, isn't that true?
>
> A:      True.

*Id*. at 157:2–157:17 (emphasis added).

Human Resources Operations Manager Riddick also testified about what she learned from plaintiff's co-worker, Kenneth Gayden:

> Q:      And on December 6th, 2012 you met with Kenneth Gayden?
>
> A:      Yes.
>
> Q:      Mr. Gayden told you that Woodard made a statement quote people are not living right and it is wrong to be a lesbian, isn't that true?
>
> A:      Yes.

Q:      But again, in your professional opinion, *stating in the workplace that people are not living right and it's wrong to be a lesbian does not constitute discrimination or harassment*, correct?

A:      Correct.

Q:      *You also don't believe that making such comments in the workplace violates the law*, correct?

A:      I do not.

Q:      *And Gayden also told [you that] Donald Woodard has problems with females*, true?

A:      Yes.

Q:      So, at this point, two people told you, Ms. Roberts and Kenneth Gayden, that Woodard had issues with females in the workplace but you did not investigate the issue, correct?

A:      I did not.

Q:      You didn't feel it was important, correct?

A:      Not at that time.

Q:      *You never felt it was important to look into the allegations that Mr. Woodard had a history of disrespecting women* at UPS, is that correct?

A:      That is correct.

Q:      Ken Gayden also told you that *Donald Woodard said people who aren't living right are demons*, true?

. . .

A:      Yes, he did tell me that, yes.

Q:      And in your opinion the comment people who are not— aren't living right are demons made in the workplace does not constitute discrimination or harassment, true?

A:      That's true.

Q: Mr. Gayden also told you that *Donald Woodard spoke to other employees about Ms. Roberts's sexual preference*, true?

A: Yes.

Q: And in your opinion, discussing other employee's sexual preference in the workplace does not constitute discrimination or harassment, true?

A: True.

*Id*. at 157:18–159:11 (emphasis added).

Riddick testified about her knowledge of, and training in, defendant UPS's anti-discrimination and anti-harassment policies, and New York City Human Rights Law:

Q: Ms. Riddick, during your employment at UPS you received annual training in discrimination and harassment policies, correct?

A: I have, yes.

Q You also received training as to discrimination based on sexual orientation, correct?

A: Correct.

Q: You're also familiar with the various statutes that prohibit discrimination in the workplace such as the New York City Human Rights Law, correct?

A: Correct.

Q: And you understand the type of conduct that constitutes a hostile work environment, correct?

A: I do, yes.

. . .

Q: And in your opinion, repeated or continual comments in the workplace constitutes a hostile work environment, isn't that true?

A: Yes.

Q:      Ms. Riddick, you're also fully aware of UPS's professional conduct and anti-harassment policy, correct?

A:      Correct.

Q:      And you've reviewed this policy multiple times, correct?

A:      Yes.

Q:      You were trained on this policy annually, correct?

A:      Yes.

Q:      . . . Ms. Riddick, please take a look at Joint Exhibit Number 1, let me know when you're done.

A:      I'm all set with this.

Q:      This is UPS's professional conduct and anti-harassment policy I was just asking you about, correct?

A:      Yes, it is.

Q:      And this is the one that Donald Woodard signed on January 27th, 2012, correct?

A:      Yes.

. . .

Q:      You were trained on this policy annually, correct?

A:      Yes.

Q:      *UPS's professional conduct and anti-harassment policy* states, and it's in front of you, in paragraph two, harassment of any *person* or group of persons on the basis of race, sex, national origin, disability, *sexual orientation,* gender identity, veteran military status, pregnancy, age or religion is a form of unlawful discrimination which *is specifically prohibited in the UPS community* and which may subject the company and/or the individual harasser to liability. Accordingly, derogatory or other inappropriate remarks, slurs, threats or jokes will not be tolerated. Correct?

A:      Correct.

Q:      Mr. Woodard also received that policy, correct?

A:      Yes, he did.

Q:      And he reviewed and signed this policy every year, correct?

A:      To my knowledge, yes.

*Id*. at 159:12–25, 160:5–161:1, 161:6–24 (emphasis added).

Riddick then testified about concluding the investigation and finding plaintiff's

complaints unsubstantiated:

Q:      Based on all of your training your knowledge in the law and UPS's policies and procedures, after concluding your investigation into Ms. Roberts's complaints you determined that her complaint was unsubstantiated, correct?

A:      Correct.

Q:      Ms. Roberts's complaint was unsubstantiated because the core of her complaints, according to you, did not align with what is prohibited by UPS's professional conduct anti-harassment policy I just read to you, correct?

A:      Correct.

Q:      Have you ever read that policy, Ms. Riddick?

A:      I have.

*Id*. at 161:25–162:11.

Soon thereafter, plaintiff asked her union shop steward, Vincent Pietraniello, about the

status of the investigation.  Trial Tr. 54:16–21, June 15, 2015 (Roberts).  He told plaintiff that her

complaints were "*probably unfounded*," given that Woodard was still allowed to supervise

plaintiff.  *Id*. at 54:24–55:2 (Roberts) (emphasis added).

### 6. December 5, 2012: Alteration of Plaintiff's Time Card

On December 3, 2012, in the middle of the second investigation, plaintiff received permission from her supervisors, Christina Wyman and Michelle Torres, to miss work on December 4, 2012 in order to appear in traffic court. *Id.* at 55:10–15 (Roberts). This permission was memorialized in her time card. Roberts Timecard, Ex. P-2, at 705799, Dec. 4, 2012. But, when plaintiff returned to work on December 5, 2012, her time card stated "no call"—*i.e.* that she never notified UPS that she had to miss work on December 4. Trial Tr. 55:18–20, June 15, 2015 (Roberts); Roberts Employee Statistics Timesheet, Ex. P-23. Woodard denied plaintiff's charge that he altered the time card. Trial Tr. 293:18–294:7, June 17, 2015 (Woodard).

### 7. Early December 2012: Second Investigation Ends

In early December 2012, UPS's second investigation into plaintiff's complaint ended. Trial Tr. 150:12–15, June 16, 2015 (Riddick). *Defendant gave Woodard no written warnings in connection with plaintiff's complaint, and Woodard continued to supervise plaintiff in the near term.* Trial Tr. 315:3–10, June 17, 2015 (Woodard). Riddick and other senior management determined that the appropriate discipline for Woodard would be a transfer to a different facility, a review of the UPS policy, and his completion of two written statements:

> Q:      The discipline that Donald Woodard received as a result of Ms. Roberts's complaint was he was sent to another location, he had to review the UPS discrimination policy that he was trained in every year and he was forced to write two statements after meeting with you. That's all, correct?
>
> A:      That's correct.
>
> Q:      With regard to disciplining Mr. Woodard, you consulted with your manager, Brian Dougherty and the division manager Kevin Beinhacker, correct?
>
> A:      That's correct.

. . .

Q:      And after all of that, *UPS was not able to substantiate Ms. Roberts's complaints*, is that correct?

A:      That's correct.

Q:      And *that's because you never once believed his conduct constitutes discrimination, is that true?*

A:      That's true.

Trial Tr. 162:21–164:6, June 16, 2015 (Riddick) (emphasis added).

### 8.  Early December 2012: Complaint to New York State Division of Human Rights

In early December 2012, plaintiff filed a complaint of discrimination with the New York State Division of Human Rights ("NYSDHR").  Trial Tr. 66:2–3, June 15, 2015 (Roberts).  She informed her shop stewards, Vincent Pietraniello and Phil Montenegro, as well as her union delegate, Steven Oz, about the complaint.  *Id.* at 66:20–24.

### 9.  December 21, 2012: Plaintiff Hit with Packages During Work

On December 21, 2012, while sorting packages, plaintiff placed packages in a bin to her left, and then turned back to the chute which releases new packages for sorting.  *Id.* at 62:24–63:5.  As she reached for new packages, a number of packages fell and hit her face, shoulder, arm and hand.  *Id.* at 63:6–10.  She looked up and saw Woodard above her.  *Id.* at 63:23–25.  He was attempting a UPS procedure called "breaking the jam," but he had not followed safety protocol, which required notifying everyone in the area and stopping the conveyor belt.  *Id.* at 63:23–65:1; *but see* Trial Tr. 294:8–298:21, June 17, 2015 (Woodard) (contending safety procedure was not required in that instance).  Woodard was familiar with and had followed this safety protocol in the past.  Trial Tr. 65:2–5, June 15, 2015 (Roberts); Trial Tr. 318:1–20, June 17, 2015 (Woodard).

Plaintiff wrote again to the NYSDHR, stressing the adverse impact this and other incidents had on her health:

> I find it strange that after I made a complaint[] against Donald Woodard my time being change [*sic*] from a call in to NO CALL NO SHOW, him making states [*sic*] about me being a lesbian, NOW I'M GETTING HIT WITH BOXES. As I have stated before I don't feel safe around Donald Woodard . . . . I asked Mike Rectner [*sic*] isn't United Parcel Service procedure to notify and secure? Mike Rectner [*sic*] stated yes it is. I asked Mike how come Donald Woodard is still around me? Mike Rectner [*sic*] stated things take time [with the] United Parcel Service . . . . Mike Rectner [*sic*] stated he will notify the division manager Kevin Beinnacher of the incident, with Donald and I. Mike Rectner [*sic*] also stated he knows it's uncomfortable in sort . . . . I have reached out to security, Human Resources, night sort manager, training manager and Corporate in United Parcel Service. *Donald Woodard is still harassing me first verbally and now physically . . . . Why is Donald Woodard able to have contact with me?* As far as I'm concerned United Parcel Service has done nothing to defuse [*sic]* the situation. United Parcel Service allowed a hostile work environment to continue. At this point I'm afraid of what Donald Woodard will do next. The company isn't trying to protect me. Everytime [*sic*] I go to the bathroom they write it down. I have a health issue that's why I go to the bathroom so much. *I'm extremely stressed out over all of this; I'm a nervous wreck, I can't perform my job the way I use to*.

Roberts Letter to NYSDHR, Ex. P-3 at 705799 8–9 (emphasis added).

Woodard was not "written up" or disciplined for the incident. Trial Tr. 320:8–12, June 17, 2015 (Woodard). The injuries plaintiff sustained required her to take time off until mid-February 2013. Trial Tr. 69:8–70:4, June 15, 2015 (Roberts).

In January 2013, Woodard was transferred to a different facility. Trial Tr. 162:15–163:1, 224:3–10, June 16, 2015 (Riddick).

Plaintiff testified that Woodard's treatment caused her emotional and physical distress:

> My hair has [fallen] out. My hair was this length, but now you see I'm wearing a wig right now. *I'm stressed out because of the stress of the job*, okay. I can't sleep, it's hard for me to sleep.

> Okay. . . . I cry a lot.  I actually cry, it's a lot.  It's a lot,  it's a lot,
> it's a lot.  *It's causing problems in my marriage* for me and my
> wife, the stress because I can't be, I just don't want to say that.  It's
> a lot. It's a lot.  It's a lot.  It's a lot.  It's a lot.

Trial Tr. 73:15–74:5, June 15, 2017 (Roberts) (emphasis added).

### IV.    Legal Standards for District Courts' Review of Jury's Verdict

#### A.  Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) permits a post-verdict motion for a new trial or

entry of judgment against the plaintiff.  It states:

> If the court does not grant a motion for judgment as a matter of
> law made under Rule 50(a), the court is considered to have
> submitted the action to the jury subject to the court's later
> deciding the legal questions raised by the motion.  No later than
> 28 days after the entry of judgment—or if the motion addresses a
> jury issue not decided by a verdict, no later than 28 days after the
> jury was discharged—the movant may file a renewed motion for
> judgment as a matter of law and may include an alternative or
> joint request for a new trial under Rule 59.  In ruling on the
> renewed motion, *the court may*: (1) *allow judgment on the verdict*,
> if the jury returned a verdict; (2) *order a new trial*; or (3) *direct
> the entry of judgment [for defendant] as a matter of law*.

Fed. R. Civ. P. 50(b) (emphasis added).

The Rule "provides that if a jury returns a verdict for which there is not a legally

sufficient evidentiary basis, the District Court may either order a new trial or direct the entry of

judgment as a matter of law."  *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 172

(E.D.N.Y. 2012).  Evidence must be considered "in the light most favorable to the non-moving

party and give that party the benefit of all reasonable inferences that the jury might have drawn

in its favor from the evidence."  *Id*. at 173 (citations omitted).  Granting judgment as a matter of

law is "proper only if the evidence is such that, without weighing the credibility of the witnesses

or otherwise considering the weight of the evidence, there can be *but one conclusion* as to the

verdict that reasonable persons could have reached." *Id.* at 173–74 (citations omitted) (emphasis added); *see also id.* at 178 (granting judgment as a matter of law because a "manifest injustice" would occur if a verdict under NYCHRL—based on impact felt outside the boundaries of New York City—were allowed to stand).

The standard that applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50 is the same as that for pre-trial motions for summary judgment pursuant to Rule 56. *Id.* at 173 (citations omitted).

**B. Motion for a New Trial**

Federal Rule of Civil Procedure 59 provides, in relevant part, that a court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial . . . ." Fed. R. Civ. P. 59(a)(1). "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Welch*, 871 F. Supp. 2d at 174 (citing 12 *Moore's Federal Practice*, ¶ 59.13(1) at 59–43 (3d ed. 2005)); *see also* 12 *Moore's Federal Practice*, ¶ 59.13 (3d ed. 2015) (same).

It is easier to prevail on a Rule 59 motion than on a Rule 50 motion:

> In comparison to a Rule 50 motion, the [Court of Appeals for the] Second Circuit has held that the standard for a Rule 59 motion in some respects is *less onerous* for the moving party in two ways: first, unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Second, in deciding a Rule 59 motion a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.

*Slack v. Cnty. of Suffolk*, 50 F. Supp. 3d 254, 263 (E.D.N.Y. 2014) (emphasis added) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)).

Jury decisions should be approached with deference and respect. The jury is a primary constitutional vehicle for dispensing justice. It expresses the will and good sense of the community. It should not be lightly ignored. Trial judges tend to be out of touch with what goes on in the world about them. Allowing a jury verdict to stand whenever practical adds to fair adjudications acceptable to litigants as well as the community at large. A new trial should be granted under Rule 59 only if the court determines that the jury's verdict was "seriously erroneous" or constituted a "miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (per curiam) (stating standard and holding that the district correctly applied the standard in granting a new trial).

## V. New York City Human Rights Law

### A. Context

*"[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."* *Lawrence v. Texas*, 539 U.S. 558, 579 (2003) (emphasis added).

The nation continues to seek equality, understanding and acceptance of lesbian, gay, and bisexual members of our community. Acceptance of differences has dramatically increased.

> In twentieth century America, discrimination against gay people reached remarkable proportions. In the first half of the century, for example, the State of New York prohibited theaters from staging plays with lesbian or gay characters, many states prohibited bars and restaurants from serving gay people, and the federal government banned gay people from employment. Until the 1960s, all states outlawed sexual intimacy between men. Many municipalities launched police campaigns to suppress gay meeting places and sought to purge gay civil servants from employment. These policies worked to create and reinforce the belief that gay men and lesbians comprised an inferior class of people to be shunned by other Americans.

Official discrimination was accompanied by private condemnation of homosexuality and discrimination against gay people, with a similarly enduring negative effect. Hollywood studios enforced a censorship code that for decades prohibited the discussion of gay issues or the appearance of gay or lesbian characters in film; press campaigns fostered frightening stereotypes of homosexuals as child molesters; and leading medical associations declared that homosexuality was a pathological condition or disease.

Brief of the Organization of American Historians as *Amicus Curiae* in Support of Petitioner at 2–3, *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) ("Amicus Br. of Org. of Am. Historians").

When the American Psychiatric Association published the first Diagnostic and Statistical Manual of Mental Disorders in 1952, homosexuality was classified as a mental disorder, a position adhered to until 1973 . . . . Only in more recent years have psychiatrists and others recognized that sexual orientation is *both a normal expression of human sexuality and immutable*.

*Obergefell*, 135 S.Ct. at 2596 (citations omitted) (emphasis added).

Gay men and lesbians saw their situation begin to improve in the 1970s. But their limited gains precipitated a powerful opposition movement that initiated scores of referendum campaigns to repeal or prohibit newly-won protections against discrimination. No other group in American history has been confronted with as many referenda designed to take away its rights. In the 1980s, the early press coverage of AIDS reinforced the view that homosexuals were diseased and threatened other Americans. Mothers who identified as lesbian often lost custody of their children.

Amicus Br. of Org. of Am. Historians at 3–4.

In the late 20th century, following substantial cultural and political developments, same-sex couples began to lead more open and public lives and to establish families. This development was followed by a quite extensive discussion of the issue in both governmental and private sectors and by a shift in public attitudes toward greater tolerance.

*Obergefell*, 135 S.Ct. at 2596 (citations omitted). The following graphic shows the shift in public perception with respect to sexual orientation (and gender identity):



**Social Acceptance: Past, Present and Future [of Lesbian, Gay, Bisexual and Transgender People]**

*% of all LGBT adults saying*

*Compared with 10 years ago, society is now . . . of people who are LGBT*

More accepting 92
No different 4
Less accepting 3

*10 years from now, society will be . . . of people who are LGBT*

More accepting 92
No different 6
Less accepting 2

Notes: Based on all LGBT (N=1,197). Those who didn't answer are not shown.

Pew Research Center                                                    LGBT/54,55

*A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times*, Pew Research Center, at 30 (June 13, 2013), http://www.pewsocialtrends.org/files/2013/06/SDT_LGBT-Americans_06-2013.pdf (last accessed July 20, 2015) (bracketed text added).

Federal courts, largely following changing community attitudes, have "shift[ed their] trajectory" with respect to gay and lesbian rights.  Katie Eyer, *Brown, Not Loving: Obergefell and the Unfinished Business of Formal Equality*, 125 Yale L.J. Forum 1, 5 (2015) (referring to the United States Supreme Court); *see also Romer v. Evans*, 517 U.S. 620, 635–36 (1996) (declaring unconstitutional an amendment to Colorado's Constitution that prohibited legislative, executive, or judicial protections of gays and lesbians); *Lawrence*, 539 U.S. at 578–79 (declaring

unconstitutional Texas law that prohibited certain consensual intimate contact between same-sex persons); *United States v. Windsor*, 133 S.Ct. 2675, 2693 (2013) (declaring unconstitutional section 3 of the federal Defense of Marriage Act which defined "marriage" and "spouse" as excluding same-sex partners); *Obergefell*, 135 S.Ct. at 2588 (declaring unconstitutional the laws of Kentucky, Ohio, Michigan, and Tennessee that either ban same-sex marriage or refuse to recognize same-sex marriages performed out of state, and holding that marriage is a fundamental right). *But see* Brief of BiLaw as *Amicus Curiae* in Support of Petitioners at 5, *Obergefell*, 135 S.Ct. 2584 ("In litigation affecting gay and bisexual individuals, there has been an unfortunate trend of bisexual exclusion from briefings and court opinions.").

The "project of achieving formal equality—itself just the first step in the longer project of achieving real equality on the ground—is not yet won for the [lesbian, gay and bisexual] rights movement." Eyer, *supra*, at 3. And "gay men and lesbians continue to live with the legacy of anti-gay laws and hostility." Amicus Br. of Org. of Am. Historians at 4; *see also* Brief for the United States as *Amicus Curiae* Supporting Petitioners at 6, *Obergefell*, 135 S.Ct. 2584 (animus towards gay, lesbian, bisexual or transgender people is the second-most common motivation for hate crimes, increasing twenty-one percent between 1996 and 2013 as hate crimes overall dropped thirty-two percent in same timespan) (*comparing* Federal Bureau of Investigation, 2013 Hate Crime Statistics tbl.1,https://www.fbi.gov/about-us/cjis/ucr/hate-crime/2013/tables/1tabledatadecpdf/table_1_incidents_offenses_victims_and_known_offenders_by_bias_motivation_2013.xls, *with* Federal Bureau of Investigation, 1996 Hate Crime Statistics tbl.1, https://www.fbi.gov/about-us/cjis/ucr/hate-crime/1996/hatecrime96.pdf); Press Release, Centers for Disease Control and Prevention, CDC Report Finds Gay, Lesbian and Bisexual Students at Greater Risk for Unhealthy, Unsafe Behaviors (June 6, 2011),

http://www.cdc.gov/media/releases/2011/p0606_yrbsurvey.html (students who identify as gay, lesbian or bisexual face "dramatic disparities for so many different health risks"); Mark L. Hatzenbuehler *et al.*, *Structural Stigma and All-Cause Mortality in Sexual Minority Populations*, 103 Soc. Sci. & Med. 33 (2014) (finding in a study with a small sample size that life expectancy of sexual minorities living in communities with high levels of anti-gay prejudice is twelve years shorter than for those living in low prejudice communities); Brief of Services and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders in Support of Petitioners at 26–27, *Obergefell*, 135 S.Ct. 2584 ("LBGT people are under-represented at the top of the income pyramid and over-represented at the bottom." (citations omitted)); Brief of the Human Rights Campaign and 207, 551 Americans as *Amici Curiae* Supporting Petitioners at 3, *Obergefell*, 135 S.Ct. 2584 ("Because of the sting of social disapproval and the persistence of discrimination in nearly every facet of everyday existence, for most of the twentieth century and continuing even today, many gay people have lived their lives 'in the closet' so as not to risk losing a job, a home, or the love and support of family and friends."); Amicus Br. of Org. of Am. Historians at 23 ("A 2012 survey of homeless youth providers discovered that almost [forty] percent of the homeless youth they serve identify as lesbian, gay, bisexual, or transgender." (citing Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Service Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless*, The Williams Institute (2012))); Brief of BiLaw as *Amicus Curiae* in Support of Petitioners at 13, *Obergefell*, 135 S.Ct. 2584 ("Bisexuals . . . face consistent prejudice and exclusion from both the heterosexual and gay communities, and lack the same protective sense of community when faced with bias and discrimination."). Following changing public perception, the law is in transition.

### B. Employment Discrimination Based on Sexual Orientation

#### 1. Historical Context

"Employment discrimination against gay, lesbian, and bisexual persons has a long history of acceptance." Robin C. Miller, *Federal and State Constitutional Provisions as Prohibiting Discrimination in Employment on Basis of Gay, Lesbian, or Bisexual Sexual Orientation or Conduct*, 96 A.L.R. 5th 391 (originally published in 2002).

> The McCarthy Era 'Lavender Scare' [of the 1950's] drummed up fears about [lesbian, gay, bisexual and transgender ("LGBT")] people in the federal government or other official positions, viewing them both as intrinsically immoral and a security threat at risk of blackmail. Thousands of federal workers were fired based on accusations of homosexuality, and the witch hunts soon spread to state and local governments. The military, which had already engaged in systematic attempts to screen out gays and lesbians in World War II, upped its efforts to root out 'sexual deviants' in the ranks. The [Federal Bureau of Investigations] and the Post Office investigated and tracked LGBT people, often disclosing the information they uncovered to employers, who would promptly fire their LGBT employees . . . . Starting in the 1970s, LGBT rights advocates began pushing for laws that would prohibit discrimination on the basis of sexual orientation in employment, housing, and public accommodations.

Jacob Richards, *From One to Windsor: Sixty Years Movement for LGBT Rights*, GP SOLO, November/December 2014, at 35–37, http://www.americanbar.org/content/dam/aba/publications/gp_solo_magazine/november_december_2014/gpsm_v031n06_14nov_dec.authcheckdam.pdf (last accessed July 20, 2015); *see also* Amicus Br. of Org. of Am. Historians at 11–12.

#### 2. Prevalence of Workplace Discrimination in the 21st Century

A 2013 Pew Research Center survey found that twenty-one percent of lesbian, gay, bisexual and transgender respondents reported "being treated unfairly" by their employers because of their sexual orientation (or gender identity). *See A Survey of LGBT Americans:*

*Attitudes, Experiences and Values in Changing Times*, Pew Research Center, at 1 (June 13, 2013), http://www.pewsocialtrends.org/files/2013/06/SDT_LGBT-Americans_06-2013.pdf (last accessed July 20, 2015); *see also* Jennifer C. Pizer *et al*., *Evidence of Persistent and Pervasive Workplace Discrimination Against LGBT People: The Need for Federal Legislation Prohibiting Discrimination and Providing for Equal Employment Benefits*, 45 Loy. L. Rev. 715, 722–28 (2012); Brad Sears & Christy Mallory, *Documented Evidence of Employment Discrimination & Its Effects on LGBT People*, The Williams Institute (July 2011), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf (last accessed July 20, 2015); Brief of LGBT Student Organizations as *Amici Curiae* in Support of Petitioners at 31–32, *Obergefell*, 135 S.Ct. 2584 (discussing the difficulties of identifying as LGBT in a job search).

### 3. Protections at the Federal Level

No federal statute *explicitly* protects against employment discrimination on the basis of sexual orientation. *Cf.* Employment Non-Discrimination Act of 2013, S. 815, 113th Cong. § 2 (2013) ("The purposes of this Act are . . . (1) to address the history and persistent, widespread pattern of discrimination on the bas[is] of sexual orientation . . . by . . . employers [and] . . . (2) to provide an explicit, comprehensive Federal prohibition against discrimination on the bas[is] of sexual orientation . . . including meaningful and effective remedies for any such discrimination . . . .") (The text, which passed the Senate on November 7, 2013, never passed the House of Representatives); Paul Kane, *The Next Battle in the Gay Rights Movement Kicks Off on Capitol Hill*, Washington Post (July 23, 2015), http://www.washingtonpost.com/politics/the-next-battle-in-gay-rights-movement-kicks-off-on-capitol-hill/2015/07/23/0d565804-314b-11e5-8f36-18d1d501920d_story.html (last accessed July 23, 2015) (Equality Act, introduced in both

houses of Congress, would grant gays and lesbians "the same protections as African Americans and other minorities from discrimination in the workplace, in getting loans and housing, jury duty selection and other public accommodations."). Instead, "unlike race discrimination—which is proscribed by statute in the employment, public accommodations, housing and voting rights domains—federal statutory law is largely silent on . . . sexual orientation discrimination, leaving vast domains of private discrimination unaddressed." Eyer, *supra*, at 6, 8 n.31 (collecting cases denying sexual orientation claims under Title VII).

The Court of Appeals for the Second Circuit has joined other circuits in holding that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, does not prohibit discrimination based on sexual orientation. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005) (plaintiff "cannot satisfy the first element of a prima facie case under Title VII because the statute does not recognize [gays and lesbians] as a protected class"); *Rodas v. Town of Farmington*, 567 F. App'x 24, 26 (2d Cir. 2014) (summary order) (stating standard); *Giudice v. Red Robin Int'l, Inc.*, 555 F. App'x 67, 68 (2d Cir. 2014) (summary order) (same); Brian Soucek, *Perceived Homosexuals: Looking Gay Enough for Title VII*, 63 Am. U. L. Rev. 715, 722 (2014) (citations omitted) ("[F]ederal courts have almost universally refused to derive protection for sexual orientation from Title VII's 'sex' prong . . . . [T]he Ninth Circuit held that Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended to include [same-sex sexual orientation]. Since then, every other circuit to address the issue has agreed: Title VII does not prohibit harassment or discrimination because of sexual orientation." (citation omitted)); *but see* Stephanie Rotondo, *Employment Discrimination Against LGBT Persons*, 16 Geo. J. Gender & L. 103, 110 (2015) ("sex discrimination claims [under Title VII] . . . have been fairly successful for gay, lesbian, and

bisexual plaintiffs *when* the harassment is based on the plaintiff's noncompliance with *gender stereotypes*, rather than strictly on his or her *sexual orientation*" (emphasis added)) (collecting cases).

A change towards federal protection has been primarily a result of administrative sensitivity to the problem. "Federal agencies charged with enforcement of civil rights laws also have recently emphasized that discrimination experienced by lesbian, gay, bisexual, and transgender people is often discrimination based on nonconformity with gender-based expectations—and in these circumstances such discrimination constitutes sex discrimination." Brief of National Women's Law Center, Williams Institute Scholars of Sexual Orientation and Gender Identity, and Women's Legal Groups as *Amici Curiae* in Support of Petitioners at 18, *Obergefell*, 135 S.Ct. 2584 (collecting examples); *see also* Exec. Order No. 13672, 79 Fed. Reg. 42971 (July 21, 2014) (prohibiting, *inter alia*, discrimination in hiring by federal contractors on the basis of sexual orientation); David Alexander & Lisa Shumaker, *Pentagon Bars Discrimination Against Gays, Lesbians in Uniform*, Reuters: Politics (June 9, 2015), http://www.reuters.com/article/2015/06/09/us-usa-military-gays-idUSKBN0OP2BD20150609 (last accessed July 23, 2015) (stating that "the Pentagon has updated its equal opportunity policy to bar discrimination based on sexual orientation, putting it in the same category as discrimination based on race, religion, color, age and sex."); Memorandum from EEOC Commissioner Chai Feldblum on Employment Protections for LGBT Persons under Federal Sex Discrimination Law & the Continuing Need for Explicit Laws Protecting LGBT People to American Bar Association's 8th Annual Section of Labor and Employment Law Conference (September 2014), http://www.glad.org/uploads/docs/publications/eeoc-clarifies-protections.pdf (last accessed July

20, 2015) (EEOC's September 2014 summary of evolving protections against discrimination based on sexual orientation and gender identity); Eric S. Dreiband & Brett Swearingen, *The Evolution of Title VII—Sexual Orientation, Gender Identity, and the Civil Rights Act of 1964*, Jones Day (April 2015), http://www.jonesday.com/files/Publication/07f7db13-4b8c-44c3-a89b-6dcfe4a9e2a1/Presentation/PublicationAttachment/74a116bc-2cfe-42d2-92a5-787b40ee0567/dreiband_lgbt.authcheckdam.pdf (last accessed July 20, 2015) (summarizing, *inter alia*, evolution of interpretation of Title VII with respect to sexual orientation).

On July 16, 2015, the Equal Employment Opportunity Commission ("EEOC") issued a landmark ruling—binding on all federal agencies—criticizing federal courts for "simply cit[ing to] earlier and dated decisions without any additional analysis" when they interpreted Title VII's prohibition of sex-based discrimination not to include protections against sexual orientation discrimination. *See Complainant v. Foxx*, EEOC Decision No. 0120133080, at 12 n.11 (July 16, 2015). It wrote:

> [M]any courts have gone to great lengths to distinguish adverse employment actions based on "sex" from adverse employment actions based on "sexual orientation." The stated justification for such intricate parsing of language has been the *bare conclusion* that "Title VII does not prohibit . . . discrimination because of sexual orientation." [*Dawson*, 398 F.3d at 35] (quoting *Simonton v. Runyon*, 232 F.3d. 33, 35 (2d Cir. 2000)).
>
> . . .
>
> Some of these decisions reason that Congress in 1964 did not intend Title VII to apply to sexual orientation and, therefore, Title VII could not be interpreted to prohibit such discrimination . . . But as a unanimous Court stated in *Oncale v. Sundowner Offshore Services, Inc.*, "*statutory prohibitions often go beyond the principal evil [they were passed to combat] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.*" 523 U.S. 75, 79, 78–80 (1998) (holding that same-sex harassment is actionable under Title VII). *Interpreting the sex*

*discrimination prohibition of Title VII to exclude coverage of lesbian, gay or bisexual individuals who have experienced discrimination on the basis of sex inserts a limitation into the text that Congress has not included.* Nothing in the text of Title VII "suggests that Congress intended to confine the benefits of [the] statute to heterosexual employees alone." *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d. 1212, 1222 (D. Or. 2002).

Some courts have also relied on the fact that Congress has debated but not yet passed legislation explicitly providing protections for sexual orientation . . . . But the Supreme Court has ruled that "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (citations omitted) (internal quotation marks omitted).

The idea that congressional action is required (and inaction is therefore instructive in part) rests on the notion that protection against sexual orientation discrimination under Title VII would create a new class of covered persons. But analogous case law confirms this is not true. When courts held that Title VII protected persons who were discriminated against because of their relationships with persons of another race, the courts did not thereby create a new protected class of "people in interracial relationships." *See, e.g., Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 588–89 (5th Cir. 1998), *reinstated in relevant part, Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) (en banc). And when the Supreme Court decided that Title VII protected persons discriminated against because of gender stereotypes held by an employer, it did not thereby create a new protected class of "masculine women." *See* [*Price Waterhouse v. Hopkins*, 490 U.S. 228, 239–40 (1989)] (plurality opinion). Similarly, when ruling under Title VII that discrimination against an employee because he lacks religious beliefs is religious discrimination, the courts did not thereby create a new Title VII basis of "non-believers." *See, e.g., EEOC v. Townley Eng'g & Mfg. Co*., 859 F.2d 610, 621 (9th Cir. 1988). These courts simply applied existing Title VII principles on race, sex, and religious discrimination to these situations. Further, the Supreme Court was not dissuaded by the absence of the word "mothers" in Title VII when it decided that the statute does not permit an employer to have one hiring policy for women with pre-school children and another for men with pre-school children. *See*

> *Phillips v. Martin-Marietta*, 400 U.S. 542, 534–44 (1971) (per curiam). *The courts have gone where principles of Title VII have directed.*

*Id.* at 12–14 (emphasis added).

Relying on *principles of Title VII* in protecting against sex-based discrimination, the EEOC reasoned:

> Title VII's prohibition of sex discrimination means that employers may not "rel[y] upon sex-based considerations" or take gender into account when making employment decisions. *See* [*Price Waterhouse*, 490 U.S. at 239, 241–42] . . . . This applies equally in claims brought by lesbian, gay, and bisexual individuals under Title VII.

> When an employee raises a claim of sexual orientation discrimination as sex discrimination under Title VII, the question is not whether sexual orientation is explicitly listed in Title VII as a prohibited basis for employment actions. It is not. Rather, the *question for purposes of Title VII coverage of a sexual orientation claim is the same as any other Title VII case involving allegations of sex discrimination—whether the agency has "relied on sex-based considerations" or "take[n] gender into account" when taking the challenged employment action.*

> . . .

> Discrimination on the basis of sexual orientation is premised on sex-based preferences, assumptions, expectations, stereotypes, or norms. *"Sexual orientation" as a concept cannot be defined or understood without reference to sex.* A man is referred to as "gay" if he is physically and/or emotionally attracted to other men. A woman is referred to as a "lesbian" if she is physically and/or emotionally attracted to other women . . . . It follows, then, that *sexual orientation is inseparable from and inescapably linked to sex and, therefore, that allegations of sexual orientation discrimination involve sex-based considerations.*

> . . .

> *Sexual orientation discrimination is also sex discrimination because it is associational discrimination on the basis of sex.* That is, an employee alleging discrimination on the basis of sexual orientation is alleging that his or her employer took his or her sex

into account by treating him or her differently for *associating* with a person of the same sex. For example, a gay man who alleges that his employer took an adverse employment action against him because he associated with or dated men states a claim of sex discrimination under Title VII; the fact that the employee is a man instead of a woman motivated the employer's discrimination against him. Similarly, a heterosexual man who alleges a gay supervisor denied him a promotion because he dates women instead of men states an actionable Title VII claim of discrimination because of his sex.

*In applying Title VII's prohibition of race discrimination, courts and the [Equal Employment Opportunity] Commission have consistently concluded that the statute prohibits discrimination based on an employee's association with a person of another race, such as an interracial marriage or friendship. See, e.g., Floyd v. Amite [Cnty. Sch.] Dist.*, 581 F.3d. 244, 249 (5th Cir. 2009) . . . ; *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) ("We . . . hold that an employer may violate Title VII if it takes action against an employee because of an employee's association with a person of another race."). This is because an employment action based on an employee's relationship with a person of another race necessarily involves considerations of the employee's race, and thus constitutes discrimination because of the employee's race.

This analysis is not limited to race discrimination . . . .

Therefore, Title VII similarly prohibits employers from treating an employee or applicant differently than other employees or applicants based on the fact that such individuals are in a same-sex marriage or because the employee has a personal association with someone of a particular sex. Adverse action on that basis is, "by definition," discrimination because of the employee or applicant's sex. *Cf. Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race [in violation of Title VII.]") . . . .

*Sexual orientation discrimination also is sex discrimination because it necessarily involves discrimination based on gender stereotypes.* In *Price Waterhouse*, the Court reaffirmed that Congress intended Title VII to "strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." 490 U.S. at 251 (quoting *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 702 n.13 (1978)). In the wake

of *Price Waterhouse*, courts and the [EEOC] have recognized that lesbian, gay and bisexual individuals can bring claims of gender stereotyping under Title VII if such individuals demonstrate that they were treated adversely because they were viewed—based on their appearance, mannerisms, or conduct—as insufficiently "masculine" or "feminine." But as the [EEOC] and a number of federal courts have concluded in cases from 2002 onwards, discrimination against people who are lesbian, gay or bisexual on the basis of gender stereotypes often involves far more than assumptions about overt masculine or feminine behavior.

Sexual orientation discrimination and harassment "[are] often, if not always, motivated by a desire to enforce heterosexually defined gender norms." *Centola v. Potter*, 183 F. Supp. 2d. 403, 410 (D. Mass. 2002) . . . .

*Id.* at 5–11 (emphasis added) (footnotes omitted). Applying the "words of the statute Congress has charged us with enforcing[,]" the EEOC held:

An employee could show that the sexual orientation discrimination he or she experienced was sex discrimination *because it involved treatment that would not have occurred but for the individual's sex; because it was based on the sex of the person(s) the individual associates with; and/or because it was premised on the fundamental sex stereotype, norm or expectation that individuals should be attracted only to those of the opposite sex.*

*Id.* at 14 (emphasis added).

### 4. Protections at the State Level

A minority of states—twenty-two states and the District of Columbia—protect against discrimination in employment based on sexual orientation. Rotondo, *supra*, at 105 n.9 (listing twenty-one of the states and their respective statutes which protect against sexual-orientation discrimination in the workplace); Antidiscrimination and Religious Freedom Amendments, 2015 Utah Laws Ch. 13 (S.B. 296) (effective May 12, 2015) (prohibiting discrimination based on sexual orientation and gender identity). They "largely cluster in the Northeast and Pacific states. This leaves most [lesbian, gay, bisexual or transgender] people in the Midwest, South and

Mountain states with limited legal options to address experiences of discrimination based on sexual orientation and gender identity in the workplace."  Angeliki Kastanis, GIF: LGBT Employment Protections Over Time, The Williams Institute Data Blog: LGBTstats (May 2, 2015), http://williamsinstitute.law.ucla.edu/datablog/employment-protections-over-time/#sthash.JtTZhA2m.dpuf (last accessed July 20, 2015) (referring to lesbian, gay, bisexual and transgender community).



American Civil Liberties Union, *Non-Discrimination Laws: State by State Information - Map*, https://www.aclu.org/map/non-discrimination-laws-state-state-information-map (last accessed on July 16, 2015).

Even where protections do exist, relatively few actions based on sexual orientation discrimination have been brought according to the Government Accounting Office.  U.S. Gov't Accountability Off., GAO-13-700R, *Sexual Orientation/Gender Identity Employment*

*Discrimination* 2 (2013), http://www.gao.gov/assets/660/656443.pdf (last accessed July 16,

2015); *see also Annual Discrimination Complaints to State Agencies Prohibiting Sexual*

*Orientation and/or Gender Identity*, The Williams Institute (November 2008),

http://williamsinstitute.law.ucla.edu/wp-content/uploads/Badgett-Sears-Ramos-Discrimination-

Comp-State-Agencies-Nov-2008.pdf (last accessed July 21, 2015).

### 5.  Protections at the Local Level

Over two hundred cities and counties have passed nondiscrimination employment laws

with regard to sexual orientation.  Lydia E. Lavelle, *Grassroots Gay Rights: Legal Advocacy at*

*the Local Level*, 21 Am. U. J. Gender Soc. Pol'y & L. 507, 519 (2013) (citation omitted); *see also*

Christy Mallory & Brad Sears, *An Evaluation of Local Laws Requiring Government Contractors*

*to Adopt LGBT-Related Workplace Policies*, 5 Alb. Gov't L. Rev. 478 (2012).  NYCHRL is one

such law.

### 6.  New York City Human Rights Law

"Although the text of the NYCHRL mirrors the [New York State Human Rights Law

N.Y. Exec. Law § 296] . . . the New York City Council [, in 2005,] broadened the protection of

the NYCHRL *see* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85

('Restoration Act')."  *McDonnell v. Schindler Elevator Corp.*, No. 12-CV-4614, 2014 WL

3512772, at *15 (S.D.N.Y. July 16, 2014), *aff'd*, No. 14-2816-CV, 2015 WL 4038567 (2d Cir.

July 2, 2015) (summary order).  The Restoration Act was passed "based on an understanding that

local discrimination laws were being undermined by courts which failed to distinguish between

the New York City Human Right Law . . . and its state and federal counterparts."  *Kumaga v.*

*New York City Sch. Const. Auth.*, 910 N.Y.S.2d 405 (Sup. Ct. 2010).  It "mandated a complete

reevaluation of all relevant provisions," *id.*, stressing a more protective interpretation than the federal or state law:

> The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

N.Y.C. Admin. Code § 8–130 (enacted pursuant to N.Y.C. Local Law No. 85, §7 (2005)).

"As a result of this revision, [NYCHRL] now explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the [NYCHRL's] uniquely broad and remedial purposes, which go beyond those of counterpart State or federal civil rights laws." *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66 (1st Dep't 2009); *see also Tate v. Rocketball, Ltd.*, 45 F. Supp. 3d 268, 274–75 (E.D.N.Y. 2014) ("Courts construe the NYCHRL's provisions broadly in favor of [] plaintiffs, to the extent that such a construction is reasonably possible." (citations omitted)).

### C. Law: Direct Liability of Employer

"The NYCHRL imposes strict liability on employers for discriminatory acts of managerial employees." *Garrigan v. Ruby Tuesday, Inc.*, No. 14-CV-0155, 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014) (citations omitted); *see* N.Y.C. Admin. Code § 8–107(13)(b)(1) ("an employer is liable for the acts of its employees: (1) where the offending employee exercised managerial or supervisory responsibility").

### D. Law: Hostile Work Environment

NYCHRL explicitly prohibits discrimination based on sexual orientation. The Law states:

> It shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of the actual or perceived . . . sexual orientation . . . of any person . . . to discriminate against such person in . . . conditions . . . of employment.

N.Y.C. Admin. Code § 8–107(1)(a). It is unlawful to create a hostile work environment based on discrimination because of sexual orientation. The standards for discrimination and hostile work environment are the same. *Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014). It is plaintiff's burden to establish a *prima facie* case. But plaintiff "need not establish that the conduct was severe or pervasive, only that she has been treated less well than other employees . . . at least in part for a discriminatory reason[,]" because of her membership in a protected class. *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450–52 (E.D.N.Y. 2013) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013)); *see also Dillon v. Ned Mgmt.*, No. 13-CV-2622, 2015 WL 427921, at *10 (E.D.N.Y. Feb. 2, 2015) (same). Severity and pervasiveness are only relevant when considering damages. *Mihalik*, 715 F.3d at 110 (citing *Williams*, 61 A.D.3d at 76).

What is reasonable in the workplace—friendly chit chat or hurtful comment—is being gradually redefined by case law and jury verdicts.

> Even if the plaintiff establishes that she was treated less well because of her gender, defendants may assert an affirmative defense whereby they can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.

*Mihalik*, 715 F.3d at 111 (citation omitted).

"[A] single comment . . . made in circumstances where that comment would, for example, signal views about the role of [a protected class] in the workplace[,]" may be considered more than a "petty slight or trivial inconvenience[.]" *Dillon*, 2015 WL 427921, at

40

*11 (citing *Williams*, 61 A.D.3d at 80 n.30); *see also Hernandez v. Kaisman*, 103 A.D.3d 106, 115 (1st Dep't 2012) (holding that "comments and emails objectifying women's bodies and exposing them to sexual ridicule, even if considered isolated, clearly signaled that defendant considered it appropriate to foster an office environment that degraded women" and therefore could be actionable under NYCHRL).

In "weighing both the plaintiff's claim and the defendant's affirmative defense, courts must consider the totality of the circumstances without ignoring the overall context in which the challenged conduct occurs." *Johnson*, 990 F. Supp. 2d at 446 (citations omitted).

After plaintiff has proffered her *prima facie* case, "[t]he employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but [a defendant will succeed] on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." *Mihalik*, 715 F.3d at 111 n.8 (citations omitted) (reversing motion for summary judgement and remanding for new trial).

### E. Law: Retaliation

On retaliation, section 8–107(7) of the Administrative Code makes it unlawful to retaliate against a person who complains about illegal discrimination or a hostile work environment:

> It shall be an unlawful discriminatory practice for any person . . . to retaliate or discriminate in any manner against any person because such person has (i) *opposed any practice forbidden under this chapter*, (ii) *filed a complaint*, testified or assisted in any proceeding under this chapter, (iii) *commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter*, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

N.Y.C. Admin. Code § 8–107(7) (emphasis added).

"*Retaliation claims under the NYCHRL cover a broader range of conduct*" than *discrimination claims*. *Richardson v. Bronx Lebanon Hosp.*, No. 11-CV-9095, 2014 WL 4386731, at *10 (S.D.N.Y. Sept. 5, 2014) (emphasis added). To establish a retaliation claim under the NYCHRL, a plaintiff must prove that: (1) she engaged in a protected activity; (2) her employer was aware that she participated in such activity; (3) she suffered an action that would be reasonably likely to deter a person from engaging in the protected activity; and (4) there is a causal connection between the protected activity and the adverse action. *See Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 739–40 (2d Dep't 2013) (stating standard); *see also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004) (same); *Mihalik*, 715 F.3d at 112 (finding that plaintiff presented sufficient evidence of retaliation to overturn summary judgment; remanded for trial on violation of NYCHRL).

The retaliation "need not result in . . . a materially adverse change in the terms and conditions of employment . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." *Williams*, 61 A.D.3d at 70–71 (citing N.Y.C. Admin. Code § 8–107(7)) (finding assignment "to duties outside or beneath one's normal work tasks" could deter a person from engaging in a protected activity). "A decision on whether an action was reasonably likely to deter the plaintiff must be made in light of *the [New York] City Council's goal of melding the broadest vision of social justice with the strongest law enforcement deterrent*." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012) (citation omitted), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (emphasis added).

When assessing a retaliation claim that involves neither an ultimate action of discharge nor a materially adverse change in the terms and conditions of employment, "it is important that

the assessment be made with a keen sense of workplace realities, of the fact that the chilling

effect of particular conduct is context-dependent, and of the fact that a jury is generally best

suited to evaluate the impact of retaliatory conduct in light of those realities." *Id.* (citations

omitted).

In proving a causal connection, plaintiff may rely on a slight temporal link, provided it is

not unreasonably attenuated. There is no bright line rule. *See, e.g.*, *Dixon v. Int'l Fed'n of

Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order) ("To the extent [plaintiff]

relies on the temporal proximity [of one year] between these two events as circumstantial

evidence of causation, that, standing alone, is insufficient.") (citing *Clark Cnty. Sch. Dist. v.

Breeden*, 532 U.S. 268, 273 (2001)). Much depends on the sense of the jury about how long a

discriminatory blow stings. The Court of Appeals for "the Second Circuit has found the two acts

sufficiently close when the lapse was between twelve days and eight months." *Encarnacion v.

Isabella Geriatric Ctr., Inc.*, No. 11-CV-3757, 2014 WL 7008946, at *8 (S.D.N.Y. Dec. 12,

2014) (collecting cases); *cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)

(holding that "[t]he three-week period from [plaintiff's] complaint to her termination is

sufficiently short to make a prima facie showing [under Title VII] of causation indirectly through

temporal proximity"). But this period does not constitute a fixed line.

"There is a relative paucity of instructive case law devoted to the independent application

of the NYCHRL" generally. *Grant v. Cont'l Cas. Co.*, No. 13-CV-5675, 2015 WL 1499724, at

*12 (S.D.N.Y. Mar. 30, 2015). More specifically, there remains an open question as to whether,

after the plaintiff establishes a *prima facie* case, the *McDonnell Douglas* burden-shifting test

applies to retaliation claims under the NYCHRL, and to what extent. *See Mihalik*, 715 F.3d at

110 n.8 ("It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting

analysis has been modified for NYCHRL claims"); *Zann*, 737 F.3d at 843 n.3 (recognizing a lack of clarity but not resolving the issue). In the instant case, the court need not resolve this question because both parties stipulated, through their consent to the jury charge, that no such shifting was applicable; and a shifting charge would have been likely to confuse instead of clarify. *See* Trial Tr. 331, 340–341, June 17, 2015.

### F. Guiding Principles for Both Claims

The Court of Appeals for the Second Circuit has summarized the guiding principles for analyzing claims of discrimination and retaliation under NYCHRL. The law requires interpretation different from state and federal statutes, and it tends to favor plaintiffs:

> (1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims;
>
> (2) the totality of the circumstances must be considered because the overall context in which the challenged conduct occurs cannot be ignored;
>
> (3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages;
>
> (4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences;
>
> (5) while courts may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context; and
>
> (6) summary judgment is still appropriate in NYCHRL cases, but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory.

*Mihalik*, 715 F.3d at 113 (citations omitted).

### G. Application of Facts to Hostile Work Environment Law

Defendant argues that plaintiff fails to make a *prima facie* case of hostile work environment because she presents only "petty slights and trivial inconveniences." Def.'s Br. 4. To the contrary, Woodard's continuing discriminatory comments about plaintiff's sexual orientation, made over a number of years, show adverse differential treatment. So too do the significant failures of supervisors to protect plaintiff against discrimination. *See supra* Part III.A–F.

There was sufficient evidence for a jury to conclude that a reasonable person—who repeatedly was the target of such comments as plaintiff and repeatedly complained but found no recourse—would consider the comments more than a trivial inconvenience.

### H. Application of Facts to Retaliation Law

It is not disputed that: (1) plaintiff is a member of a protected class of those who may seek redress and protection from discrimination; and (2) that defendant was aware of plaintiff's complaints. Def.'s Br. 6.

Defendant claims, however, that plaintiff has failed to produce evidence that defendant engaged in retaliatory conduct reasonably likely to deter a person from engaging in the protected activity. Def.'s Br. 7–8. It also contends that the relationship between the protected activity of the worker's complaint and the employer's adverse punitive reaction to the exercise of the right to complain was too diluted by time and dubious causal connection. *Id.*

Retaliation may be subtle and hidden and can be hard to prove. Juries are therefore given more leeway in finding retaliation than in finding discrimination. *See supra* Part V.E.

The jury had ample grounds to find retaliation likely to deter a worker from complaining of abuse. Woodard and the defendant's deliberate adverse conduct—the jury could have found—

would likely deter a person from engaging in plaintiff's protected activity (identifying as a lesbian). First, not only did Woodard harass plaintiff over a course of approximately six years, but he *harassed her after she complained repeatedly*, to her supervisors and to him, of his ongoing adverse conduct. *See supra* Part III.A–F. Second, the jury could find that shortly after the second investigation, plaintiff's time card was changed by Woodard as a punishment for protesting. Third, the jury could find plaintiff was hit with packages by Woodard in retaliation. *See supra* Part III.F.6–9. Fourth, it could find that defendant's decision to allow Woodard to supervise plaintiff after her repeated complaints demonstrated so much disdain by management as to itself constitute retaliation. *See supra* Part III.A–F. Fifth, Riddick's investigation yielded no tangible results, despite substantial evidence of harassment; this know-nothing attitude was itself a form of retaliation by an implied expression of contempt for plaintiff's complaints.

## VI.    Remittitur of Compensatory Damages

### A.  Law

A trial court may grant remittitur where it deems a damages verdict excessive. *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (finding jury's award of $125,000 to be excessive under Title VII and NYCHRL). An award is excessive where it "shock[s] the judicial conscience." *Id.* at 560. "[I]n calculating the remittitur, the court must use the least intrusive—and most faithful to the jury's verdict—method of reducing the verdict only to the maximum that would be upheld by the trial court as not excessive." *Id.* at 559–60 (citations omitted).

"In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory

terms, without relating either the severity or consequences of the injury." *Id.* at 560 (citations omitted).

Considered are the amounts awarded in the comparable cases, "bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc*., 746 F. Supp. 2d 575, 600 (S.D.N.Y. 2010) (citations omitted). "Garden variety" claims generally merit awards of approximately $30,000–$125,000. *See, e.g.*, *Watson v. E.S. Sutton, Inc.*, No. 2-CV-2739, 2005 WL 2170659, at *16 (S.D.N.Y. Sept. 6, 2005) (reducing award to $120,000 where plaintiff suffered "no permanent psychological damage or disability resulting from the harassment" but still suffered "considerable distress"); *Johnson*, 990 F. Supp. 2d at 457 (remitting emotional distress claim to $80,000 where defendant exhibited "continuous, egregious behavior" toward plaintiff, who sought therapy, but where there was "limited evidence of any lasting physical or emotional impact on [p]laintiff as well as the lack of corroborative testimony").

### B. Application of Facts to Law

The parties concede that the damages in the instant case are "garden variety." Def.'s Reply 9; Pl.'s Opp'n. 11–12.

Defendant challenges the compensatory damages award of $25,000 per count, arguing that it exceeds the appropriate range for "garden variety" emotional distress claims. Def.'s Reply 12. These modest awards are well within an acceptable reasonable range. *See supra* Part VI.A.

Second, defendant contends that compensatory damages for the two claims may not be based on the same evidence of emotional distress. Def.'s Reply 8–9. Each damages award was sufficiently causally connected to a separate cause of action. No duplication existed.

The award was appropriate in light of the evidence presented to the jury. The motion for remittitur is denied.

## VII. Punitive Damages

### A. Law

Punitive damages are available under New York City Administrative Code § 8–502(a):

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a cause of action . . . for *damages, including punitive damages*, . . . unless such person has filed a complaint with the City Commission on Human Rights or with the State Division of Human Rights with respect to such alleged unlawful discriminatory practice . . . .

N.Y.C. Admin. Code § 8–502(a) (emphasis added).

In analyzing punitive damages, the same federal standard applies under the NYCHRL and the federal law. *Johnson*, 990 F. Supp. 2d at 449. "A plaintiff can satisfy this burden by presenting evidence that (1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, *or* (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Caravantes v. 53rd St. Partners, LLC*, No. 09-CV-7821, 2012 WL 3631276, at *25 (S.D.N.Y. Aug. 23, 2012) (emphasis added) (citations omitted).

When awarding punitive damages, mitigation based on the existence and scope of anti-discrimination policies and procedures may be considered. *See* N.Y.C. Admin. Code §§ 8–107(13)(e)–(f). To mitigate damages, a defendant must demonstrate that it "[e]stablished and complied with policies, programs and procedures for the prevention and detection of unlawful discriminatory practices by employees [and] agents . . . and have a record of no, or relatively

few, prior incidents of discriminatory conduct by such employee, agent . . . or other employees."

N.Y.C. Admin. Code §§ 8–107(13)(d)(1)–(2).  Mitigation may include:

> (i) A meaningful and responsive procedure for investigating complaints of discriminatory practices by employees[ or] agents . . . and for taking appropriate action against those persons who are found to have engaged in such practices;
>
> (ii) A firm policy against such practices which is effectively communicated to employees, agents . . . ;
>
> (iii) A program to educate employees and agents about unlawful discriminatory practices under local, state, and federal law; and
>
> (iv) Procedures for the supervision of employees and agents . . . specifically directed at the prevention and detection of such practices.

N.Y.C. Admin. Code §§ 8–107(13)(d)(1)(i)–(iv).

### B.  Standard of Review for Vacatur of Punitive Damages Awards

The United States "Supreme Court set forth three categories of factors to be considered in assessing the validity of a punitive damage award.  These factors include:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Zakre*, 344 F. App'x at 630–31 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)) (applying United States Supreme Court test to NYCHRL claims).

### C.  Application of Facts to Law

Defendant moves for vacatur of the jury's award of punitive damages, alleging that plaintiff did not demonstrate that defendant acted with "malice" or "reckless indifference." Def.'s Br. 14; Def.'s Reply 13–15.  It claims that punitive damages are inappropriate under the circumstances because upon notification of Woodard's actions, defendant conducted a prompt

49

investigation in accordance with UPS's anti-harassment policy and took affirmative remedial measures to rectify the situation. Def.'s Br. 14; Def.'s Reply 14. Asserted is a claim that plaintiff has failed to prove a pattern of "turning a blind eye" to reports of discrimination and retaliation. Def.'s Reply 15.

To the contrary, plaintiff demonstrated sufficiently for a jury finding that defendant acted with reckless indifference to her multiple complaints of sexual orientation discrimination over many years. *See supra* Part III.A–F. UPS was anything but prompt. By 2012, when Riddick, a high-level manager for defendant, conducted an investigation, she determined, contrary to the overwhelming evidence of discrimination, that no discrimination had occurred. She did not discipline Woodard in any meaningful fashion and allowed him to continue supervising plaintiff for a short period.

Even if plaintiff failed to demonstrate that defendant retaliated because of her complaints by altering her time card and by failing to provide a safe work environment for plaintiff, there was sufficient proof of retaliation in central administration's cavalier attitude towards plaintiff's serious charges of harassment.

Plaintiff is entitled to punitive damages as a matter of law under the NYCHRL. The modest award for each claim was appropriate in light of the evidence before the jury. The motion to vacate the punitive damages award is denied.

## VIII. Conclusion

Defendant's motion for judgment as a matter of law is denied. There was a legally sufficient evidentiary basis to support the jury's verdict that defendant UPS subjected plaintiff to a hostile work environment based on her sexual orientation. *See generally* Trial Tr. June 15–

June 17, 2015. There was sufficient evidence to establish that plaintiff was retaliated against for complaining about the hostile work environment. *See id.*

Defendant's motion for a new trial is denied. There is no evidence of a miscarriage of justice warranting the extraordinary relief of a new trial. *See id.*

Defendant's motion for remittitur of compensatory damages is denied. The compensatory damage award of $25,000 for each claim is warranted. *See id.*

Defendant's motion to vacate the punitive damage award is denied. The award of $25,000 to each claim is appropriate in light of the evidence before the jury since UPS created a hostile work environment, based on plaintiff's sexual orientation, and retaliated against her for complaining. *See id.*

The Clerk of the Court shall enter judgment in accordance with the jury's verdict, plus costs.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: July 27, 2015
Brooklyn, New York